940 So.2d 331 (2005)
Michael IRVIN
v.
STATE of Alabama.
CR-01-2229.
Court of Criminal Appeals of Alabama.
June 24, 2005.
Rehearing Denied November 18, 2005.
Certiorari Denied April 21, 2006.
*339 Kyla L. Groff Kelim, Alexander City, for appellant.
William H. Pryor, Jr., and Troy King, attys. gen., and Anne C. Adams and Henry M. Johnson, asst. attys. gen., for appellee.
Alabama Supreme Court 1050289.
WISE, Judge.
Michael Irvin was convicted of two counts of murder made capital in connection with the death of Jackie Thompson because it was committed during the course of a robbery in the first degree and because it was committed by or through the use of a deadly weapon while the victim was in a vehicle. See § 13A-5-40(a)(2) and (a)(17), Ala.Code 1975. The jury recommended, by a vote of 10 to 2, that Irvin be sentenced to death. The circuit court accepted the jury's recommendation and sentenced Irvin to death.
The State's evidence tended to show that on November 12, 1997, Jackie Thompson left work and drove to the home of his girlfriend, Lawanda Fallin. Fallin lived in a mobile home in Pinkard's Trailer Park in Tuskegee. Thompson, who lived in Eclectic, was employed by Pennington Construction Company, a company located in Montgomery. During November 1997, however, Thompson was assigned to a project in Tuskegee, allowing him to spend more time with Fallin.
Thompson went to Fallin's mobile home to attend a birthday party for Michael Irvin, Fallin's brother. Fallin, Irvin, Toria Howard, and two infantsone belonging to Fallin and one to Howardwere present at Fallin's mobile home when Thompson arrived. Later, Alister Butler arrived. After everyone arrived, the guests played cards, watched television, and drank alcoholic beverages.
Later that night, the guests left Fallin's mobile home and walked next door to the mobile home where Fallin's mother lived. Everyone prepared a plate of food and then went back to Fallin's mobile home to eat. The guests then played cards for a while, before Thompson, Butler, and Irvin left Fallin's mobile home.
The three men were gone for approximately one hour. When they returned, Fallin noticed that Thompson was very quiet, a marked contrast from his "energetic" high-spirited behavior earlier that evening. Fallin further noticed that Butler and Irvin exhibited no change in their demeanor, and they continued to drink and talk in much the same way as they had before leaving the party.
Shortly after the three men returned to Fallin's mobile home, Thompson told Fallin that he had to leave. This surprised Fallin, because Thompson had been planning to spend the night with her. Thompson left the mobile home by himself. This was the last time Fallin saw Thompson alive. Moments after Thompson departed, Irvin and Butler also left Fallin's mobile home.
On November 13, 1997, Walter Vail was at his farm in south Macon County when he discovered a burned automobile on his property. No body was found in the vehicle. Vail telephoned the Macon County Sheriff's Department and reported his discovery. Law-enforcement officials subsequently determined that the burned automobile was registered to Jackie Thompson. The Macon County Sheriff's Department contacted the Wetumpka Sheriff's Department, and an officer was sent to inform Thompson's mother, Mary Splunge, of the discovery. Thereafter, Ms. Splunge went to the Wetumpka Police Department and filed a missing person's report on her son.
Law-enforcement officials questioned Irvin on November 17, 1997, regarding Thompson's disappearance. Irvin told officers *340 that he had last seen Thompson at his sister's mobile home on November 12, 1997. Irvin also told the officers that Thompson was known to him as someone who sold drugs and guns.
Jackie Thompson's disappearance remained unsolved until 1999. In September 1999, Irvin was arrested and charged with the murder of Dacqurie Lane. On October 4, 1999, Irvin gave a statement to law-enforcement officials in which he admitted being present when Thompson was killed. Irvin told officers that after Thompson left Fallin's mobile home, he, Butler, and Thompson met up later that night on a dirt road in an isolated area of Macon County. While Thompson was seated in the driver's seat of his automobile, Butlerwho was standing outside Thompson's vehicleshot Thompson in the head with a rifle. Afterwards, Irvin and Butler took approximately $3,000 from Thompson's body. Irvin told officers that Butler put Thompson's body in the backseat of Thompson's vehicle, and then Butler drove Thompson's car to an isolated area in another part of Macon County. Irvin followed Butler in Butler's car to the location where they planned to dispose of Thompson's vehicle. Butler and Irvin moved Thompson's body from Thompson's vehicle to the trunk of Butler's vehicle, and set fire to Thompson's vehicle. Irvin and Butler left that location and drove to yet another isolated area of Macon County where they left Thompson's body. On October 5, 1999, Irvin took the officers to the spot where he and Butler had disposed of Thompson's body. Law-enforcement officials discovered Thompson's remains in a rural part of Macon County, approximately 26.4 miles from where Walter Vail had discovered Thompson's vehicle on November 13, 1997. Irvin and Butler were arrested and charged with two counts of capital murder arising out of the death of Jackie Thompson.
State Medical Examiner Dr. James Lauridson used dental records to identify the remains found in Macon County on October 5, 1999, as those of Jackie Thompson. During Irvin's trial, Dr. Lauridson testified that the injuries to Thompson's skull were consistent with a gunshot wound to the head. Dr. Lauridson acknowledged that the wounds could have been caused by another type of weapon, such as an iron rod; however, he stated that given the nature of the injuries, such a scenario was "unlikely."
Toria Howard, Irvin's former girlfriend, also testified at Irvin's trial. Howard testified that during an argument with Irvin in the summer of 1998, Irvin threatened her and said that "he would blow [her] fucking brains out like he did Jackie and that nigger in Atlanta." The State also offered the testimony of Norman Williams regarding Irvin's participation in the 1999 robbery and murder of Dacqurie Lane for the purpose of proving identity, motive, and intent under Rule 404(b), Ala.R.Evid. Williams testified that he was with Irvin when Irvin robbed and then killed Lane by shooting him in the head as Lane sat in his vehicle. Williams testified that after Irvin shot and killed Lane, he and Irvin dumped Lane's body in a remote area of Macon County, before taking Lane's vehicle to another remote location and setting fire to it.
After both sides had rested and the circuit court had instructed the jury on the law applicable to Irvin's case, the jury returned a verdict finding Irvin guilty of two counts of capital murder, as charged in the indictment.
During the penalty phase of Irvin's trial, the State resubmitted all of the evidence it had introduced during the guilt phase. The State also offered evidence that in 1991 Irvin had been convicted of armed robbery in Fulton County, Georgia. Irvin *341 offered the testimony of two witnesses, Agent Raymond Smith of the Alabama Bureau of Investigation ("ABI") and March Cameron, Irvin's mother. Agent Smith testified that Irvin appeared remorseful when he took him to where he and Butler had disposed of Thompson's body. Cameron described Irvin as a "good son," and she testified regarding various details about her son's life, including the fact that Irvin's father had been killed when Irvin was approximately two years old. Cameron also testified that following his 1998 Georgia armed-robbery conviction, he was released early, based on his good behavior. Finally, she testified that while in jail awaiting trial, Irvin "gave his life to Christ." After both sides had rested and the circuit court had instructed the jury on the law applicable to the penalty-phase proceeding, the jury initially returned a verdict, by a vote of 9 to 3, that Irvin be sentenced to death. The circuit court instructed the jury that it could not return a verdict recommending death where only 9 jurors had recommended death, and it reinstructed the jury on the applicable law. The jury retired to resume deliberations, and subsequently returned a verdict recommending, by a vote of 10 to 2, that Irvin be sentenced to death.

Standard of Review
In every case in which the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As this Court stated in Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim. App.1999), aff'd, 820 So.2d 152 (Ala.2001):
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Although Irvin's failure to object at trial will not preclude this Court from reviewing an issue in this case, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

Guilt-Phase Issues

I.
Irvin argues that his Sixth Amendment right to a speedy trial was violated because of the 32-month delay between his *342 arrest and trial. Because Irvin did not raise this issue at trial, we review this claim under the plain-error doctrine.
Alabama courts use the four-part test established by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in determining whether a defendant has been denied his right to a speedy trial. This test involves a weighing and balancing of four factors: (1) the length of delay; (2) the reason for delay; (3) the assertion of the right; and (4) any prejudice suffered by the appellant. Barker, 407 U.S. at 530, 92 S.Ct. 2182.

A. Length of Delay

To calculate the length of the delay, courts measure the time from the date of arrest or indictment to the date of trial. "The right to a speedy trial is triggered when a criminal prosecution has begun." Ex parte Carrell, 565 So.2d 104, 107 (Ala.1990), cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). See also Russaw v. State, 624 So.2d 234, 237 (Ala.Crim.App.1993); Wells v. State, 619 So.2d 228, 229 (Ala.Crim.App.1993).
"`See also Pierson v. State, 677 So.2d 830, 831 (Ala.Crim.App.1996) ("`[N]eutral reasons' for delay, such as a crowded court docket, do not ordinarily require a dismissal of the case based on a violation of the right to a speedy trial."); Vincent v. State, 607 So.2d 1290, 1293 (Ala.Crim.App.1992) ("`[T]he congested trial docket was a neutral reason for the delay and should not weigh heavily against the State,' . . . especially in view of the fact that the appellant did not raise a complaint during that time." (quoting Archer v. State, 643 So.2d 597, 599 (Ala.Crim.App.1991) (alteration in original))); Taylor v. State, 429 So.2d 1172, 1174 (Ala.Crim.App.1983) ("Although negligence is not weighed as heavily against the State as a deliberate attempt to delay the trial in order to hamper the defense, it must nevertheless be weighed against the State `since the ultimate responsibility for such circumstances must rest with the government rather that the defendant.' Barker, 407 U.S. at 531, 92 S.Ct. at 2192." (citation omitted)).'"
Draper v. State, 886 So.2d 105, 110-11 (Ala.Crim.App.2002), quoting Parris v. State, 885 So.2d 813, 823-24 (Ala.Crim. App.2001). Moreover, delays caused by the defendant are not included in the length of delay. Williams v. State, 601 So.2d 1062, 1067 (Ala.Crim.App.1991). "`The first Barker criterion, the length of delay, is a threshold requirement for finding a violation of the Sixth Amendment speedy trial right. If the delay is considered excessive, there will be a presumption of prejudice, and the court will consider the other Barker criteria.'" Bishop v. State, 656 So.2d 394, 396 (Ala.Crim.App. 1994) (quoting Project: Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo.L.J. 853, 1171, 1174 (1993)). If however, the delay is not considered excessive, then the court is not required to consider the remaining Barker criteria.
Although this Court has held that "the mere passage of time does not constitute a denial of a defendant's right to a speedy trial," Wooden v. State, 822 So.2d 455, 457 (Ala.Crim.App.2000), a finding that the delay was presumptively prejudicial will necessitate the evaluation of the remaining factors in Barker v. Wingo. We have held delays of 26 months and longer to be presumptively prejudicial. See Mansel v. State, 716 So.2d 234 (Ala.Crim.App.1997) (26-month delay); Howard v. State, 678 So.2d 302 (Ala.Crim.App.1996); and Vincent v. State, 607 So.2d 1290 (Ala.Crim. *343 App.1992) (31-month delay). Based on these decisions, we conclude that the delay of 32 months between Irvin's arrest and trial was presumptively prejudicial. Therefore, we will evaluate the remaining Barker criteria.

B. Reasons for the Delay

While under arrest for another murder, Irvin made a statement to law-enforcement officials admitting his involvement in Jackie Thompson's murder. After taking the officers to where he and his codefendant, Alister Butler, had dumped Thompson's body, Irvin was arrested and charged with capital murder on October 7, 1999. Irvin's preliminary hearing was held on January 7, 2000. Following the court's finding of probable cause, Irvin was bound over to the Spring 2000 term of the Macon County Grand Jury. On May 24, 2000, the grand jury returned an indictment charging Irvin with two counts of capital murder. Irvin was arraigned on August 3, 2000. Later that month, one of Irvin's appointed attorneys requested leave to withdraw from representing Irvin. The circuit court granted counsel's motion and appointed another attorney be part of Irvin's defense team. Irvin's counsel filed 14 pretrial motions, requiring the court to conduct two separate hearings. Finally, the court postponed Irvin's trial from its original February 2002 setting until June 2002, when the trial actually began.
Based on our examination of the record, it appears that reasons for the 32-month delay between Irvin's arrest and trial may be attributed to both the prosecution and the defense. Additionally, various portions of the delay are for neutral reasons attributable to neither side. Law-enforcement officials had to complete their investigation. Forensic analysis of Thompson's remains had to be completed to establish a cause of death. The defense filed numerous pretrial motions requiring the time and attention of the court. Given the seriousness of the charges against Irvin, the court was extraordinarily careful in ensuring that both sides had adequate time in which to prepare for trial. Because this was a capital case involving numerous witnesses, pretrial motions, and motion hearings, we find the reasons for the 32-month delay to be valid, and we see no deliberate delay by the State to enhance its own case or to prejudice the defense.

C. Assertion of the Right

As previously noted, Irvin failed to assert his constitutional right to a speedy trial below. The record contains no motion for a speedy trial. In Barker v. Wingo, the Supreme Court recognized, "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532, 92 S.Ct. 2182. Likewise, this Court has held:
"`Since there was no effort on the part of the appellant to secure his right to a speedy trial . . . he may not complain of any delay on appeal.' Tidmore [v. City of Birmingham], 356 So.2d [231,] 233 [(Ala.Crim.App.1977)]. While a defendant who fails to demand a speedy trial does not forever waive his right, this is one factor which must be considered."
Bailey v. State, 375 So.2d 519, 523 (Ala. Crim.App.1979). In Turner v. State, 924 So.2d 737, 748 (Ala.Crim.App.2002), this Court recognized that the failure of the defendant to assert his right to a speedy trial weighed against a finding of plain error regarding this claim.

D. Prejudice to the Defendant

In order to determine if actual prejudice exists, we look for (1) undue and oppressive incarceration; (2) anxiety and concern stemming from public accusation; and (3) the effect on the defendant's ability to defend himself. Barker, 407 U.S. at 532, 92 S.Ct. 2182. Although Irvin focuses *344 his argument on the first two factors, the Supreme Court has recognized that of these three factors the most serious factor to be considered is the effect of the delay on the defendant's ability to defend himself. 407 U.S. at 532, 92 S.Ct. 2182. Irvin's only argument concerning the third factor is that "several defense witnesses could not be located." However, as even Irvin acknowledges, the specific content of the absent witnesses' testimony is unknown. As this Court has held, Irvin must point to specific facts in evidence in order to support his claim of actual prejudice. "`[S]peculative allegations, such as general allegations of loss of witnesses and failure of memories, are insufficient to demonstrate the actual prejudice. . . .'" that the appellant must establish. Haywood v. State, 501 So.2d 515, 518 (Ala.Crim.App. 1986) (quoting United States v. Butts, 524 F.2d 975, 977 (5th Cir.1975), citing in turn United States v. McGough, 510 F.2d 598, 604 (5th Cir.1975)). Because Irvin does not identify these supposedly critical defense witnesses or attempt to explain how these unidentified witnesses were crucial to his defense, he has failed to establish any prejudice as a result of the 32-month delay between arrest and trial.
Moreover, Irvin's reliance upon the Alabama Supreme Court's decision in Ex parte Clopton, 656 So.2d 1243 (Ala.1995), is misplaced. Ex parte Clopton is both factually and legally distinguishable from this case. Clopton was indicted and charged with unlawful distribution of a controlled substance, as opposed to capital murder, but he was not arrested until more than 3 years after the indictment was handed down, even though law-enforcement officials could have easily located him. By contrast, Irvin was arrested mere days after he confessed to murdering Thompson. The delays between arrest and trial are easily understandable in a crime of this nature, where the defendant, if convicted, may be sentenced to death. Witnesses have to be interviewed and forensic testing completed. Numerous pretrial motions were filed, necessitating hearings. The delay in going to trial was not a deliberate tactic employed by the State. Rather, it was the result of ensuring that Irvin's rights were protected before he went on trial for his life. We fail to see how Irvin was prejudiced by this delay.
After evaluating the criteria in Barker v. Wingo, we conclude that Irvin was not denied his constitutional right to a speedy trial.

II.
Irvin argues that the circuit court erred by allowing Norman Williams and Toria Howard to testify regarding collateral bad acts because, he says, such evidence violated Rule 404(b), Ala.R.Evid., the general exclusionary rule. He further argues that these witnesses' testimony irreparably prejudiced his defense and tainted his trial, thus violating his constitutionally guaranteed right to a fair trial. The State contends that the testimony of Norman Williams and Toria Howard was properly received into evidence. Alternatively, the State argues, if admission of this evidence was error, the error was harmless in light of the overwhelming evidence of Irvin's guilt, particularly Irvin's confession.

A. Testimony of Norman Williams

Irvin argues that the circuit court erred when it allowed Norman Williams to testify about Irvin's involvement in the September 1999 robbery and murder of Dacqurie Lane. Specifically, he contends that this evidence was not probative of any issue at trial, was offered solely to establish his bad character, did not fall within an exception to the exclusionary rule, and because the probative value of the evidence *345 was outweighed by its potential prejudicial effect.
"The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App. 1998). Moreover, "`[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason.'" Peraita v. State, 897 So.2d 1161, 1183 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004) (quoting Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)).
Rule 404(b), Ala.R.Evid., provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."
Before the effective date of Rule 404(b)January 1, 1996the exclusionary rule was explained and followed by the Alabama courts. The adoption of Rule 404(b) did not abrogate prior caselaw on this topic. Hunter v. State, 802 So.2d 265 (Ala.Crim.App.2000), cert. denied, 802 So.2d 273 (Ala.2001). We note moreover, that the Alabama Supreme Court's decision in Ex parte Casey, 889 So.2d 615 (Ala.2004), while tightening the use of Rule 404(b) evidence, did not prohibit the use of such evidence. Moreover, given the particular facts of this case, we conclude that the holding in Ex parte Casey does not prohibit the admission of Norman Williams's testimony in this case.
In Robinson v. State, 528 So.2d 343 (Ala. Crim.App.1986), this Court discussed the purpose of the exclusionary rule, stating:
"`"On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question."' Pope v. State, 365 So.2d 369, 371 (Ala.Cr.App. 1978), quoting C. Gamble, McElroy's Alabama Evidence § 69.01 (3d ed.1977). `"This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors."' Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting McElroy's supra, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant's right to a fair trial. `"The jury's determination of guilt or innocence should be based on *346 evidence relevant to the crime charged."' Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983); Terrell v. State, 397 So.2d 232, 234 (Ala.Cr.App.1981), cert. denied, 397 So.2d 235 (Ala.1981); United States v. Turquitt, 557 F.2d 464, 468 (5th Cir.1977).
"`If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.' Saffold v. State, 494 So.2d 164 (Ala. Cr.App.1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App. 1984); Scott v. State, 353 So.2d 36 (Ala. Cr.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. `"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects."' Averette v. State, 469 So.2d 1371, 1374 (Ala. Cr.App.1985), quoting United States v. Turquitt, supra at 468-69. `"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." [Citation omitted.] "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"' Averette v. State, supra, at 1374."
528 So.2d at 347. See also Hocker v. State, 840 So.2d 197, 213-14 (Ala.Crim. App.2002).
Finally, both this Court and the Supreme Court have recognized that collateral-act evidencesometimes referred to as "prior bad-act evidence"need not have occurred before the now-charged crime in order to be admissible as collateral-act evidence. See, e.g., Anonymous v. State, 507 So.2d 972, 974 n. 1 (Ala.1987); Cothren v. State, 705 So.2d 849, 858-60 (Ala.Crim. App.), aff'd, 705 So.2d 861 (Ala.1997), cert. denied, 523 U.S. 1029, 118 S.Ct. 1319, 140 L.Ed.2d 482 (1998) (upholding admission of collateral-act evidence regarding appellant's participation in a robbery-homicide occurring after the crime for which he was being tried under the common plan or scheme exception); Hinton v. State, 632 So.2d 1345, 1347-48 (Ala.Crim.App.1993) (upholding admission of subsequent collateral offense to prove intent); Hayes v. State, 384 So.2d 623, 626 (Ala.Crim.App. 1979) (upholding admission of subsequent collateral act to prove intent and identity).
The collateral-act evidence concerning the robbery and murder of Dacqurie Lane was admissible under the identity exception to the general exclusionary *347 rule. See Wimberly v. State, 934 So.2d 411 (Ala.Crim.App.2005).
Collateral-act evidence is admissible to prove identity only when the identity of the person who committed the charged offense is in issue and the charged offense is committed in a novel or peculiar manner. 1 Charles W. Gamble, McElroy's Alabama Evidence § 69.01(8) (5th ed.1996); Ex parte Arthur, 472 So.2d 665 (Ala.1985); Johnson v. State, 820 So.2d 842, 861 (Ala.Crim.App.2000); Tyson v. State, 784 So.2d 328, 344 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000). "Under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are `signature crimes' having the accused's mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person." Bighames v. State, 440 So.2d 1231, 1233 (Ala.Crim.App.1983). "[E]vidence of a prior crime is admissible only when the circumstances surrounding the prior crime and those surrounding the presently charged crime `exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.'" Ex parte Arthur, 472 So.2d at 668 (quoting Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983)). See also Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); and Govan v. State, 40 Ala.App. 482, 115 So.2d 667 (1959) (recognizing that the identity exception is applicable only where both the prior crime and the charged offense were committed in the same special or peculiar manner).
When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. In other words, the physical similarity must be such that it marks the offenses as the handiwork of the accused. Thus, as Dean Charles Gamble points out, a greater degree of similarity between the charged offense and the collateral act is required for admissibility to prove identity than for admissibility to prove intent or knowledge. However, Dean Gamble goes on to note that "[e]ven if identity is not material at the outset of the case, . . . it may be made material by conduct of the defense such as cross-examining the identifying witness in such a way as to indicate mistake, by positions taken, or in argument of counsel." McElroy's Alabama Evidence, supra at § 69.01(8).
In Howell v. State, 627 So.2d 1134, 1140 (Ala.Crim.App.1993), this Court upheld the admission of collateral-act evidence to establish identity, stating that "the defendant's identity was placed into issue when he pleaded not guilty to the burglary charge and when the State was unable to positively identify the defendant as the perpetrator." Irvin argues that because he did not place his identity as the perpetrator at issue, the State was prohibited from offering collateral-act evidence to establish his identity. A careful review of the record, however, indicates otherwise. In the statement Irvin gave to ABI Agent Anthony Frost, Irvin did not say that he shot Jackie Thompson; instead, Irvin stated that Alister Butler was the person who shot Thompson. Thus, with Butler and Irvin each attempting to portray himself as the passive observere.g., an "innocent bystander"lacking the intent to rob and murder Jackie Thompson, law-enforcement officials were left with the dilemma of determining the identity of the perpetrator, as well as intent and motive. However, because Irvin was the only individual involved in both the robbery and murder of Jackie Thompson and the robbery and *348 murder of Dacqurie Lane, the testimony of Norman Williams was necessary to establish the identity of the person who robbed and murdered Jackie Thompson.
Moreover, evidence of the robbery and murder of Dacqurie Lane was admissible under the identity exception to the general exclusionary rule because he was killed in the same unique manner as Jackie Thompson. Thompson, who was 19 years old at the time of his death, was the boyfriend of Lawanda FallinIrvin's sister. Therefore, Irvin was well-acquainted with Thompson. Moreover, Irvin was present at the party Thompson attended before his disappearance on the night of November 12, 1997.
On November 13, 1997, Walter Vail discovered a burned vehicle later determined to belong to Thompson on his farm in south Macon County. Almost two years later, Thompson's remains were located in an isolated area in Macon County, approximately 26.4 miles from where his burned vehicle had been discovered. Forensic analysis of the remains indicated that Thompson had suffered serious injuries to his skull that were consistent with a gunshot to the head. Irvin told law-enforcement officials that he and Alister Butler had killed Thompson by shooting him in the head during the course of a robbery. Irvin stated that they took money from Thompson's person and then drove his car to a remote location and set it on fire. The two then took Thompson's body to another isolated area and dumped it.
The robbery and murder of Dacqurie Lane followed a similar pattern. Norman Williams testified that he, Irvin, and Lane were acquaintances. Lane was 21 years old at the time of his death. Williams testified that on September 1, 1999, he and Irvin encountered Lane on the campus of Tuskegee University. In response to the pair's request, Lane agreed to drive Irvin and Williams to where Williams's truck was parked. Once inside Lane's vehicle also a truckIrvin directed Lane to drive to a remote area of Macon County. After Lane stopped the truck, Irvin directed him to get out of the vehicle, empty his pockets, and then get on his knees. When Lane refused, Williams stated that Irvin shot him in the head. Irvin and Williams left Lane's body in the field, and they took his truck and drove to Atlanta. The pair stayed in Atlanta for two days, before returning to Tuskegee. Upon their return to Tuskegee, Irvin and Williams took Lane's truck to a remote area approximately 8-10 miles from where they had left Lane's body and set fire to the vehicle.
As can be seen, numerous similarities exist in these two incidents. In both instances, the victims were young men; Thompson was 19; Lane was 21. Both were acquainted with Irvin. Both crimes were committed at night and in Macon County. Both victims were killed in a remote area. In both cases, Irvin had an accomplice and killed the victim during the course of a robbery. In both cases, the victim's body was dumped in an isolated area of Macon County. Finally, in both cases the victim's vehicle was taken to a different isolated area in Macon County and set on fire.
Given the parallel circumstances surrounding the robbery and murder of Thompson and the robbery and murder of Lane, we conclude that the two crimes were committed "in the same novel and peculiar manner." Accordingly, the collateral-act evidence of Lane's robbery and murder was admissible under the identity exception to the general exclusionary rule.
Evidence of Irvin's participation in the robbery and murder of Dacqurie Lane was likewise admissible under the *349 intent exception to the general exclusionary rule.
Addressing the admissibility of collateral-act evidence pursuant to the intent exception, Dean Charles Gamble has written:
"If the accused is charged with a crime that requires a prerequisite intent, collateral crimes, acts or misconduct are admissible to show that the accused possessed the necessary intent. This rule is based upon the theory that because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently. Whether the collateral act has a tendency to show that the accused did possess the prerequisite state of mind is, of course, one of relevancy vested largely in the discretion of the trial court."
McElroy's Alabama Evidence § 69.01(5) (footnotes omitted).
Irvin was charged with murder committed during the course of a robbery. Thus, robbery was a material element of this offense. However, because Irvin contended that the State had failed to prove that he intended to rob Thompson, the collateral-act evidence concerning Irvin's involvement in the robbery and murder of Dacqurie Lane was admissible pursuant to the intent exception to the general exclusionary rule. See Presley v. State, 770 So.2d 104, 110 (Ala.Crim.App.1999), aff'd, 770 So.2d 114 (Ala.), cert. denied, 531 U.S. 881, 121 S.Ct. 194, 148 L.Ed.2d 135 (2000) (upholding admission of collateral-act evidence to show intent and motive when defendant argued that because he did not intend to rob the victim he could not be convicted of capital murder). Given the similarity of the facts surrounding the robbery and murder of Jackie Thompson and the robbery and murder of Dacqurie Lane, the circuit court did not err in allowing evidence relating to Dacqurie Lane's robbery and murder to be admitted into evidence under the intent exception to the general exclusionary rule.
We note that although Irvin argues to this Court that this collateral-act evidence should not have been admitted because he did not deny that he committed the robbery, an examination of the record indicates otherwise. Admittedly, Irvin did not take the stand and deny that he intended to rob Jackie Thompson; however, his defense counsel based their motion for a judgment of acquittal concerning the capital offense of robbery-homicide on the fact that the State had failed to prove Irvin intended to rob the victim. Defense counsel reiterated this claim during the penalty-phase opening argument. Additionally, counsel at one point argued that it was Irvin's codefendant Alister Butler who robbed and murdered the victim, and that Irvin had no knowledge of Butler's plan. Evidence concerning Dacqurie Lane's robbery and murder was highly probative as to whether Irvin intended to rob Thompson when he murdered him.
Moreover, as we set out above in some detail, the facts surrounding the robberies and murders of both Thompson and Lane were quite similar. In each instance, Irvin, assisted by an accomplice, encountered the victim at night. They went to an isolated area of Macon County to rob him. The victim, in each instance a young man, was outnumbered by his robbers. During the course of the robbery, Irvin killed the victim by shooting him in the head. In each case, Irvin and his accomplice took care to avoid leaving a crime scene for someone to stumble across, disposing of the victim's body and his vehicle in separate locations, and then burning the vehicle to destroy any incriminating evidence that might be left behind in the vehicle. *350 Given these circumstances, the trial court did not err in admitting the collateral-act evidence.
Finally, Norman Williams's testimony concerning Irvin's participation in the robbery and murder of Dacqurie Lane was admissible under the motive exception to the general exclusionary rule.
Evidence tending to establish motive is always admissible. Perkins v. State, 808 So.2d 1041, 1084 (Ala.Crim.App. 1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other ground, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). See also McElroy's Alabama Evidence § 70.01(12)(e). In discussing motive, the Alabama Supreme Court has stated:
"`Motive is an inducement, or that which leads or tempts the mind to do or commit the crime charged.' Spicer v. State, 188 Ala. 9, 26, 65 So. 972, 977 (1914). Motive is `that state of mind which works to "supply the reason that nudges the will and prods the mind to indulge the criminal intent."' C. Gamble, Character Evidence, [A Comprehensive Approach (1987)] at 42. `Furthermore, testimony offered for the purpose of showing motive is always admissible. It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense." (Emphasis in original, citations omitted.) Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988)."
Ex parte Register, 680 So.2d 225, 227 (Ala. 1994). "If the prior bad act falls within [the motive] exception, and is relevant and reasonably necessary to the State's case, and the evidence that the accused committed that act is clear and conclusive, it is admissible." Boyd v. State, 715 So.2d 825, 838 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
Irvin was charged with murder committed during the course of a robbery. Thus, robbery was a material element of this offense. However, because Irvin contended that the State had failed to prove that he intended to rob Thompson, the collateral-act evidence concerning Irvin's involvement in the robbery and murder of Dacqurie Lane was admissible pursuant to the motive exception to the general exclusionary rule. See McClendon v. State, 813 So.2d 936, 944 (Ala.Crim.App.2002) (upholding admission of accused's collateral act of soliciting someone to murder his first wife as relevant to prove intent and motive in prosecution for soliciting murder of accused's second wife); Presley v. State, 770 So.2d 104, 110 (Ala.Crim.App.1999), aff'd, 770 So.2d 114 (Ala.), cert. denied, 531 U.S. 881, 121 S.Ct. 194, 148 L.Ed.2d 135 (2000) (upholding admission of collateral-act evidence of other robberies to show intent and motive when defendant argued that because he did not intend to rob the victim he could not be convicted of capital murder). As discussed in detail above, given the similarity of the facts surrounding the robbery and murder of Jackie Thompson and those surrounding the robbery and murder of Dacqurie Lane, the circuit court did not err in allowing evidence of Dacqurie Lane's robbery and murder to be admitted into evidence under the motive exception to the general exclusionary rule.
Irvin also argues that the probative value of the evidence of his collateral bad act was substantially outweighed by the danger of unfair prejudice.
Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala.R.Evid. "All *351 relevant evidence is admissible, except as otherwise provided." Rule 402, Ala. R.Evid. Rule 403, Ala.R.Evid., provides:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
In Hayes v. State, 717 So.2d 30, 37 (Ala.Crim.App.1997), this Court stated:
"The power to make this determination is vested in the trial court. Zielke v. AmSouth Bank, 703 So.2d 354, 361 (Ala. Civ.App.1996); see also C. Gamble, Gamble's Alabama Rules of Evidence § 403. We will not disturb such a determination unless it is clearly an abuse of discretion."
Evidence of Irvin's collateral bad act does not fit neatly into a single recognized exception. Rather, it spills over into three of the recognized exceptions. Nevertheless, that evidence may be admissible if such evidence is relevant to the issues presented and if its probative value outweighs any prejudicial effect that that evidence might have. In Nicks v. State, 521 So.2d 1018, 1025-26 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this Court wrote:
"Alabama law provides for the admissibility of evidence of collateral crimes or acts as part of the prosecution's case-in-chief if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty because of his past misdeeds. Brewer v. State, [440 So.2d 1155 (Ala.Crim.App.1983)]. Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. . . . All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
"`All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.'
"Underhill, Criminal Evidence § 154 (3d ed.1923). If the evidence is not so remote as to lose its relevancy, the decision to allow or not allow evidence of collateral crimes or acts as part of the State's case-in-chief rests in the sound discretion of the trial judge. McGhee v. State, 333 So.2d 865 (Ala.Cr.App.1976); *352 McDonald v. State, 57 Ala.App. 529, 329 So.2d 583 (1975), writ quashed, 295 Ala. 410, 329 So.2d 596 (1976), cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976)."
As previously stated, probative evidence of collateral bad acts may be excluded only when it is "unduly and unfairly prejudicial." Here, evidence about Irvin's collateral bad act was relevant, was not admitted simply to prove Irvin's bad character, and was more probative on the issue of guilt than it was prejudicial to his defense. Accordingly, the court did not abuse its discretion in admitting this evidence.
Irvin further argues that circuit court's limiting instructions on the testimony concerning Dacqurie Lane's murder were insufficient. He also makes a sweeping assertion of a due-process violation because, he says, admission of Williams's testimony concerning the Dacqurie Lane murder "infected the trial with unfairness."
Rule 105, Ala.R.Evid., states, in pertinent part:
"When evidence which is admissible for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."
Even before the effective date of Rule 105, this Court had encouraged trial judges to give limiting instructions when evidence of a collateral act or uncharged misconduct is admitted for a limited purpose. See, e.g., Malone v. State, 659 So.2d 1006, 1009 (Ala. Crim.App.1995).
Here, Irvin requested that the jury be given a limiting instruction concerning its use of the collateral-act evidence regarding the robbery and murder of Dacqurie Lane. The circuit court agreed, and instructed the jury on the proper use of collateral-act evidence following Williams's testimony (R. 974.) The court gave a second limiting instruction as part of its jury charge at the conclusion of the guilt-phase state of Irvin's trial. Jurors are presumed to follow the judge's instructions. Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.), on return to remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). The trial court's limiting instructions were proper and sufficient in this case. See Snyder v. State, 893 So.2d 482, 486-87 (Ala.2001).
Under these circumstances, neither Rule 404(b) nor Ex parte Casey prohibits admission of the collateral-act evidence. Because the collateral-act evidence concerning the robbery and murder of Dacqurie Lane was properly admitted under the identity, motive, and intent exceptions to the general exclusionary rule, we cannot say that the circuit court abused its discretion regarding the admission of Norman Williams's testimony.

B. Testimony of Toria Howard

Irvin also contends that the trial court erred when it allowed Toria Howard, Irvin's former girlfriend, to testify regarding a statement he made to her during an argument between the two in 1998. Toria Howard testified that during an argument with Irvin, he stated that "he would blow [her] fucking brains out like he did Jackie and that nigger in Atlanta." Irvin argues that the trial court should not have allowed the jury to hear evidence (1) that he had "assaulted his girlfriend," and (2) that he had killed another person in Atlanta. Because neither of these grounds was asserted at trial, this claim is reviewed under the plain-error doctrine.
Before Irvin's capital-murder trial began, the State advised the circuit court that one of its witnesses, Toria Howard, *353 was prepared to testify that Irvin had placed a pillowcase over her head, tied her up, put a gun to her head, and warned her that "he would blow [her] fucking brains out like he did Jackie and that nigger in Atlanta." At a pretrial hearing, the court questioned the parties concerning Howard's testimony. Thereafter, the court conducted a lengthy hearing regarding Howard's proposed testimony. At the conclusion of the hearing, the court advised the State that it would not allow Howard to testify about the circumstances surrounding Irvin's threat to "blow her brains out," namely, the fact that Irvin tied Howard up, covered her head with a pillowcase, and put a gun to her head while making the threat. Accordingly, the State questioned Howard in such a way as to not reveal the circumstances surrounding Irvin's threat. Contrary to Irvin's claim, the jury did not learn of Irvin's "assault" of his girlfriend. Thus, Irvin's argument that the circuit court improperly allowed the jury to learn of his "assault" on Howard must fail.
Even if the court had allowed Howard to testify concerning the circumstances surrounding Irvin's statement, however, there would be no error. In Moore v. State, 697 So.2d 800, 803-04 (Ala. Crim.App.1996), this Court held:
"The general rule in Alabama is that the acts and declarations of the accused against his interest and having a relation to the offense charged are always competent evidence. In Nicks v. State, 521 So.2d 1018, 1028-29 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), the defendant had made a statement during a robbery to a victim that, if the victim did not do as he was told, the defendant would kill him `like he did that man up the street.' This Court held that that statement, although concerning a collateral offense, was admissible as a declaration against interest.

"`The general rule in this state relative to an accused is that the acts, declarations, and conduct of the accused, against interest, are always competent evidence. Pope v. State, 365 So.2d 369 (Ala.Cr.App.1978); Dockery v. State, 269 Ala. 564, 114 So.2d 394 (1959); Blackwell v. State, 264 Ala. 553, 88 So.2d 347 (1956). Any conduct or declaration of an accused having a relation to the offense charged, indicating a consciousness of guilt, is admissible as evidence against him. Conley v. State, 354 So.2d 1172 (Ala.Cr.App.1977).
"`In Dockery v. State, supra, the Alabama Supreme Court addressed an issue very similar to the one before us. In Dockery, the trial court allowed the admission of testimony in the defendant's murder trial to the effect that the defendant, during an apparent holdup or assault which was committed shortly after the murder, stated the following to the victim: "Don't move, you son-of-a-bitch. I will kill you like I did the man in Alabama." Dockery contended that the evidence of the subsequent, collateral, offense was inadmissible, for it was evidence of a separate and distinct offense. The supreme court held that the statement was admissible under the rule that the accused's acts, declarations, and conduct against interest are competent, citing Blackwell v. State, supra. The court held, "Evidence which is relevant to establish some element of the offense, or material as to some issue in the case, is not rendered inadmissible by the fact that it also tends to show another offense committed by defendant." 269 Ala. at 568, 114 So.2d at 397 (quoting Snead *354 v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942)). This rule is sometimes stated to the effect that, if such evidence is admissible on general grounds, it is not rendered inadmissible by the fact that it discloses offenses other than the one with which the defendant is charged; that the test of admissibility is the connection of the facts proven with the offense charged; and that, where such evidence is relevant and tends to prove the defendant's guilt, he cannot by multiplying his crimes diminish the volume of competent evidence against him. Thomas v. State, 132 Fla. 78, 181 So. 337 (1938); People v. Hall, 308 Ill. 198, 139 N.E. 123 (1923). See State v. Martin, 49 Utah 346, 164 P. 500 (1917), for a similar case where the defendant implicated himself in both the charged and collateral crimes by letters he had written. See also Ringstaff v. Commonwealth, 275 S.W.2d 946 (Ky.1955). Further, in discussing the admission of details concerning a collateral offense, the court held that proof of the circumstances attending the narration of an inculpatory statement or confession which establish the voluntary nature of such statement is admissible, and in specifically addressing the situation before it, the Dockery court noted that the statements of Dockery would hardly have made sense without the explanation of the circumstances under which they were uttered. See also Drake v. State, 257 Ala. 205, 57 So.2d 817 (1952); Tillison v. State, 248 Ala. 199, 27 So.2d 43 (1946).
"`In another similar case, People v. Glab, 15 Cal.App.2d 120, 59 P.2d 195 (1936), a prosecution of a wife for the murder of her husband, testimony as to the wife's participation in a brawl subsequent to the killing wherein she drew a gun and threatened to kill, stating that she had already killed one man, was held admissible as an admission to the previous killing and proved possession of a gun, notwithstanding the tendency of the testimony to prejudice the wife in the minds of the jurors. The court held, "The fact that incidentally such testimony may have involved facts as to the commission of another crime, or may have had a tendency to prejudice the accused in the minds of jurors, is no valid objection to its admission where, as here, the testimony was proper as tending to connect the accused with the crime charged." 15 Cal.App.2d at 124, 59 P.2d at 197-98.'
"Nicks v. State, supra, at 1028-29."
Here, Irvin's statement was made to Howard after Thompson had been missing and presumed dead for approximately one year. Irvin's statement was admissible as a declaration against interest, i.e., an admission. See Rule 801(d)(2), Ala.R.Evid.; Hagood v. State, 777 So.2d 162, 209-10 (Ala.Crim.App.1998), aff'd in part, rev'd on other grounds, 777 So.2d 214 (Ala.1999). The jury was properly instructed on the limited purpose for which it could use this evidence, and there is no evidence indicating that it did not follow the court's instructions. See Snyder v. State, 893 So.2d at 486-87.
Moreover, given the overwhelming evidence against Irvin, including his own confession of guilt, physical evidence that corroborated his confessions and connected him to the offense, and the fact that he led law-enforcement officials to Thompson's body, any error in allowing Howard to testify was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 *355 (1967). Thus, no basis for reversal exists as to this claim.

III.
Irvin also argues that the trial court erred in admitting into evidence statements he gave to law-enforcement officials on November 17, 1997, and December 9, 1997, during the investigation into Jackie Thompson's disappearance. Specifically, Irvin contends that those statements were not admissible because the officer interviewing him did not inform him of his Miranda[1] rights before taking the statements.
"Miranda warnings are not necessarily required to be given to everyone whom the police question. Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977). Miranda is only applicable when an individual is subjected to custodial interrogation. Davis v. Allsbrooks, 778 F.2d 168, 170 (4th Cir.1985); Primm v. State, 473 So.2d 1149, 1158 (Ala.Crim.App.), cert. denied, 473 So.2d 1149 (Ala.1985). `By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612.
"There is a distinction which must be made between general interrogation and custodial interrogation since Miranda is inapplicable when interrogation is merely investigative rather than accusative. Kelley v. State, 366 So.2d 1145, 1148 (Ala.Crim.App.1979); Primm, supra, at 1158; Johnston v. State, 455 So.2d 152, 156 (Ala.Crim.App.), cert. denied, 455 So.2d 152 (Ala.1984). This distinction should be made on a case-by-case basis after examining all of the surrounding circumstances. United States v. Miller, 587 F.Supp. 1296, 1299 (W.D.Pa.1984); Johnston, supra, at 156; Warrick v. State, 460 So.2d 320, 323 (Ala.Crim.App. 1984); Hall v. State, 399 So.2d 348, 351-52 (Ala.Crim.App.1981); Kelley, supra at 1149."
Hooks v. State, 534 So.2d 329, 347-48 (Ala. Crim.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). See also Hodges v. State, 926 So.2d 1060 (Ala. Crim.App.2005); Powell v. State, 796 So.2d 404, 412 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001).
Irvin was entitled to be advised of his Miranda rights only if he was under arrest or undergoing a custodial interrogation. There is no evidence indicating that Irvin was under arrest at the time he gave the statements. Thus, we must look to the circumstances surrounding Irvin's interview to determine if he was subjected to a custodial interrogation. Among the factors to be considered in determining whether an individual is undergoing custodial interrogation are:
"(1) [T]he language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual."
Hooks v. State, 534 So.2d at 348.
Here, Sgt. Michael Knowles of the Macon County Sheriff's Department testified that on November 17, 1997, he went to the mobile home of Irvin's girlfriend for the purpose of interviewing Irvin. Knowles testified that Irvin was not under arrest at the time he made his statement. Knowles stated that he did not threaten or coerce *356 Irvin and that he made no promises to Irvin in order to obtain a statement. Knowles testified that Irvin spoke with him voluntarily and that he made the statement freely. Further, Knowles testified that Irvin was not the only person he interviewed while investigating the disappearance of Jackie Thompson. In fact, Knowles interviewed a number of people regarding Thompson's disappearance.
ABI Agent Raymon Smith likewise testified that Irvin was not under arrest at the time of his December 9, 1997, interview. Agent Smith testified that he went to a mobile home located in Pinkard's Trailer Park in Tuskegee to interview Irvin. Agent Smith likewise testified that he did not threaten or coerce Irvin to obtain a statement, nor did he make any promises to Irvin. Smith further testified that Irvin was one of approximately 17 people he interviewed while investigating the disappearance of Jackie Thompson.
It is clear that at the time Irvin gave his statements he was neither under arrest nor subjected to a custodial interrogation. Accordingly, Irvin was not entitled to be advised of his Miranda rights before being interviewed.
We now address the admissibility of Irvin's statements at trial. Irvin argues that admission of the November 17 and December 9 statements violated his Fifth Amendment right, presumably his right against self-incrimination. However, during a pretrial suppression hearing, and later at trial, Irvin argued that the statements were not admissible because they constituted hearsay.
In Maddox v. State, 620 So.2d 132 (Ala. Crim.App.1993), this Court addressed whether an undercover police officer could testify as to statements the defendant made in a conversation that the deputy overheard through a wire placed in the officer's truck. We concluded that the testimony did not constitute hearsay because it was not offered to prove the truth of the matter asserted. Moreover, we held that the testimony was admissible as admissions by a party-opponent:
"In the present case, we believe that Detective Dawson's account of the conversation he overheard was properly admitted, because the importance of the statements rested on some factor other than the truth of the matter stated. The appellant's only defense (as suggested by his cross-examination of the prosecution's witnesses) was that the drug transaction described in this conversation never took place. `The significance of this conversation was that it occurred, not that the matters asserted therein were true.' Bankhead v. State, 585 So.2d 97, 102 (Ala.Cr.App.1989), aff'd in pertinent part, 585 So.2d 112 (Ala.1991). Whether Stanton had truly wanted `a twenty cent piece,' or whether he actually knew where the Holiday Trailer Park was located was wholly irrelevant. The purpose of the statements was simply to demonstrate that an agreement was reached that led to the sale of crack cocaine. Moreover, the appellant's statements were otherwise admissible as admissions by a party-opponent. McLaney v. City of Montgomery, 570 So.2d 881 (Ala.Cr.App. 1990)."
620 So.2d at 134-35. Accord Davis v. State, 673 So.2d 845, 846 (Ala.Crim.App. 1995). Here, just as in Maddox, Irvin's statements were not offered to prove the truth of the matters in those statements. Thus, admission of the statements did not violate the prohibition against hearsay. Instead, the statements were offered to establish Irvin's "guilty knowledge" and to establish that he lied to police officers who were investigating Thompson's disappearance. In any event, the statements were *357 admissible as admissions of a party-opponent. See Rule 801(d)(2), Ala.R.Evid. Accordingly, the circuit court properly admitted Irvin's November 17 and December 9 statements into evidence.

IV.
Irvin next argues that the circuit court erred in admitting into evidence the statement he gave to law-enforcement officials on October 4, 1999. Because Irvin did not object to the admission of this statement during trial, we review this claim under the plain-error doctrine.
It has long been the law that a confession is prima facie involuntary and inadmissible and that, before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate. Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App. 1990). A two-pronged test is used to determine whether an accused's statement is admissible. First, the trial court must determine whether the accused was informed of his Miranda rights. Second, the trial court must determine whether the accused voluntarily and knowingly waived his Miranda rights before making his statement. Holder v. State, 584 So.2d 872, 878 (Ala. Crim.App.1991); Carpenter v. State, 581 So.2d 1277, 1278 (Ala.Crim.App.1991).
In order for a statement to be admissible, "[t]he trial judge need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made." Jackson v. State, 516 So.2d 726, 741 (Ala.Crim.App.1985), citing Harris v. State, 420 So.2d 812, 814 (Ala. Crim.App.1982). (Emphasis added.) See also Ex parte Williams, 627 So.2d 999, 1003 (Ala.1993). Moreover, in cases involving conflicting evidence on the issue of voluntariness, the trial court's determination is entitled to great weight on appeal. D.M.M. v. State, 647 So.2d 57, 60 (Ala. Crim.App.1994). "Where the evidence of voluntariness is conflicting, and even where there is credible testimony to the contrary, the trial judge's finding of voluntariness must be upheld unless palpably contrary to the weight of the evidence." Dixon v. State, 588 So.2d 903, 908 (Ala. 1991) (citing Carr v. State, 545 So.2d 820, 824 (Ala.Crim.App.1989)) (emphasis added). See also Ex parte Jackson, 836 So.2d 979, 982 (Ala.2002).
If the first prong of the test is met, the court must then determine whether, after having been informed of his rights, the accused made a knowing and voluntary waiver of those rights. The gist of Irvin's argument appears to be that his statement should not have been admitted because he did not execute a written waiver until after he gave his statement to law-enforcement officials.
This Court addressed a similar issue in Magwood v. State, 494 So.2d 124 (Ala. Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); in that case we held:
"While all extrajudicial confessions are prima facie involuntary and can be rendered admissible only by a showing that an `express and affirmative' waiver was given, there is no set pattern or manner for a waiver. Sullivan v. State, 351 So.2d 659 (Ala.Crim.App.), cert. denied, 351 So.2d 665 (Ala.1977); Lloyd v. State, 45 Ala.App. 178, 227 So.2d 809 (1969). While a waiver will not be presumed simply from the silence of the accused after the warnings are given or simply from the fact that a confession was obtained, where the totality of the circumstances indicate that the confession was voluntary, a confession will not be excluded because the accused did not state that he understood his rights or did not sign a written waiver. North Carolina v. Butler, 441 U.S. 369, 99 *358 S.Ct. 1755, 60 L.Ed.2d 286 (1979), and cases cited therein. In Sullivan v. State, 351 So.2d at 664, this court stated:
"`Any clear manifestation of a desire to waive is sufficient. The test is a showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language but a combination of that articulation and the surrounding facts and circumstances. Lloyd, 45 Ala.App. at 184, 227 So.2d at 814.'
"In North Carolina v. Butler, 441 U.S. at 373-76, 99 S.Ct. at 1757-59, the United States Supreme Court stated:
"`An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great, but in at least some cases, waiver can be clearly inferred from the actions and words of the person interrogated.
"`. . . .
"` . . . Ten of the eleven United States Courts of Appeals and the courts of at least seventeen states have held that an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the Miranda case.' (Footnotes omitted.)"
494 So.2d at 137 (emphasis supplied). Thus, the fact that Irvin did not execute a written waiver before making his statement did not bar its admission into evidence. Indeed, this Court has held that "`[a] finding of voluntariness may be made even where a suspect refuses to sign a waiver form.'" Mack v. State, 500 So.2d 489, 493 (Ala.Crim.App.1986) (quoting Proctor v. State, 391 So.2d 1092, 1094 (Ala. Crim.App.1980)).
In the instant case, we find no evidence that Irvin's statement was involuntary. In October 1999, Mary Cameron, Irvin's mother, telephoned ABI Agent Anthony Frost. As instructed by her son, Cameron requested that Frost and U.S. Deputy Marshal Lawrence Labarge visit her son at the Montgomery County jail. Thereafter, Agent Frost and Deputy Marshal Labarge traveled to the Montgomery County jail to interview Irvin.
Agent Frost testified that at the beginning of his interview with Irvin he advised him of his Miranda rights. Agent Frost read the rights to Irvin from a waiver of rights form. Irvin advised Agent Frost that he understood his rights and that he agreed to waive his rights, but he refused to sign the waiver-of-rights form. Irvin then began talking to Agent Frost and Deputy Marshal Labarge. At the conclusion of the interview, Irvin signed the waiver-of-rights form.
Agent Frost testified that neither he nor Deputy Marshal Labarge threatened or coerced Irvin in any manner, made him any promises, or told him that it would be better for him to make a statement. During the interview, Agent Frost reduced Irvin's statement to writing. At the conclusion of the interview, Irvin read the statement and signed it, initialing the *359 places where Agent Frost had deleted something or otherwise corrected the statement. After Irvin signed the statement Agent Frost had taken down, he signed the waiver-of-rights form.
This Court has held that we will not disturb a trial court's decision on a motion to suppress "unless it is manifestly contrary to the great weight of the evidence." Whitehead v. State, 777 So.2d 781, 820 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000). Based on the totality of the circumstances, the circuit court correctly determined that Irvin's statement was voluntarily made, despite the fact that he did not sign a written waiver form until after he had given his statement to Agent Frost. Thus, the circuit court properly admitted Irvin's statement into evidence.

V.
Irvin argues that the circuit court erred when it admitted his October 4, 1999, statement before the State had established evidence of the corpus delicti.
"Under Alabama law, a confession is not admissible unless there is independent evidence tending to prove the corpus delicti." Slaton v. State, 680 So.2d 879, 897 (Ala.Crim.App.1995), aff'd 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997) (citing Spear v. State, 508 So.2d 306 (Ala. Crim.App.1987)).
"It has been the rule in Alabama that the State must offer independent proof of the corpus delicti of the charged offense to authorize the admission of a defendant's confession or inculpatory statement. Robinson v. State, 560 So.2d 1130, 1135-36 (Ala.Cr.App.1989); see C. Gamble, McElroy's Alabama Evidence, 200.13 (5th ed.1996). `"The corpus delicti consists of two elements: `(1) That a certain result has been produced, . . . and (2) that some person is criminally responsible for the act.'" Johnson [v. State, 473 So.2d 607, 608 (Ala.Cr.App. 1985),] (quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (3d ed.1977)).' Spear v. State, 508 So.2d 306, 308 (Ala.Cr.App.1987). `"Positive, direct evidence of the corpus delicti is not indispensable to the admissions of confessions."' Bracewell v. State, 506 So.2d 354, 360 (Ala.Cr.App.1986), quoting Ryan v. State, 100 Ala. 94, 14 So. 868 (1894). `The corpus delicti may be established by circumstantial evidence.' Sockwell v. State, 675 So.2d 4, 21 (Ala. Cr.App.1993), aff'd, 675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996)."
Maxwell v. State, 828 So.2d 347, 357 (Ala. Crim.App.2000).
Applying these principles of law to the instant case, we conclude that although the facts and circumstances surrounding the offenses may be inconclusive without Irvin's confession, "they do tend to prima facie show the corpus delicti of [the offense]." See Bush v. State, 695 So.2d 70, 119 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). We find the evidence presented by the State was sufficient to establish the corpus delicti of the crime. The State proved that Jackie Thompson was dead. Further, the State established a prima case from which it could be inferred that Thompson had been murdered, that the murder occurred during the course of a first-degree robbery, and that the victim was murdered while he was seated in his vehicle. Moreover, when Irvin's confession is considered together with the evidence presented by the State, there was ample evidence establishing the corpus delicti of two capital offenses: murder during the commission of first-degree robbery and murder by means of a deadly weapon while the victim *360 was inside a vehicle. See Maxwell v. State, 828 So.2d at 358.
With respect to the charge of robbery-homicide, Irvin's confessiontogether with all of the other evidence presented by the Statewas sufficient evidence from which the jury could conclude that Irvin murdered Jackie Thompson during the course of a robbery. At trial, Thompson's girlfriend testified that she last saw Thompson alive on the night of November 12, 1997. The following day, Walter Vail found a burned vehicle on his farm in Macon County. Through the investigative work of several law-enforcement officials, it was determined that the burned automobile was owned by Thompson. Thompson's mother testified that on November 14, 1997, she filed a missing person's report on her son after learning that his burned automobile had been found in an isolated area of Macon County.
In October 1999, skeletal remains of a body were found in a remote area of Macon County, approximately 26.4 miles from where Thompson's burned vehicle had been found in 1997. Irvin directed law-enforcement officials to the location of those remains. Through dental records, Dr. James Lauridson was able to identify the remains as belonging to Jackie Thompson. Dr. Lauridson further determined that the injuries to Thompson's skull were consistent with a gunshot wound to the head, and that any other cause of those wounds was "unlikely." Moreover, Irvin told law-enforcement officials that he had watched Alister Butler kill Thompson by shooting him in the head while Thompson was sitting in the driver's seat of his vehicle. The two stole Thompson's money and his automobile, dumped Thompson's body in an isolated area of Macon County, then took Thompson's car to a different location where they set it on fire.
This evidence was likewise sufficient to establish the corpus delicti of murder by use of a deadly weapon while the victim is inside a vehicle. The fact that Irvin and Butler dumped Thompson's body in south Macon County and then drove his vehicle 26.4 miles to another remote area of the county before burning it tends to indicate that Irvin and Butler wished to cover their tracks by disposing of evidence that they had murdered Thompson while he was seated inside that vehicle. Irvin told law-enforcement officials as much.
We find that the facts of this case and the reasonable inferences from those facts support and corroborate Irvin's confession. Accordingly, the State sufficiently proved the corpus delicti of the capital offenses and established a prima facie case of the capital offense of murder committed during the course of a robbery and a prima facie case of the capital offense of murder by use of a deadly weapon while the victim is inside a vehicle that warranted submission of the case to the jury.

VI.
Irvin argues that there was insufficient evidence upon which to sustain his convictions for the capital offenses of murdering Thompson during the commission of first-degree robbery and murdering Thompson while he was inside a vehicle. Irvin maintains that the State's evidence "consisted of his own inculpatory statement and very little corroborating evidence." (Irvin's brief, p. 100.)
"`"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth *361 v. State, 471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). `"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App. 1992). `"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision."' Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App. 1990). `The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978).
"`The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App. 1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App. 1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App. 1983)."
Gavin v. State, 891 So.2d 907, 974 (Ala.Crim.App. 2003), cert. denied, 891 So.2d 998 (Ala. 2004), cert. denied, 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005) (quoting Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App. 1992)). See also Ward v. State, 814 So.2d 899, 908-10 (Ala.Crim.App. 2000), cert. denied, 814 So.2d 925 (Ala. 2001).
"Where a defendant's conviction is based solely on circumstantial evidence, `if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed.' Ex parte Brown, 499 So.2d 787, 788 (Ala. 1986) (emphasis in original). `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App. 1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985). `It is not necessary for a conviction that the defendant be proved guilty to the "exclusion of every possibility of innocence."' Burks v. State, 117 Ala. 148, 23 So. 530 (1898). `The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.' *362 Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895)."
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App. 1989). Accord Williams v. State, 795 So.2d 753, 775 (Ala.Crim.App. 1999), aff'd, 795 So.2d 785 (Ala. 2001).
The record indicates that the State presented sufficient evidence to prove the elements of the capital offenses of murder committed during first-degree robbery and murder committed by use of a deadly weapon while the victim is inside a vehicle. Witnesses established that Thompson disappeared after attending a party on November 12, 1997, at Lawanda Fallin's mobile home in Tuskegee. The following day, Walter Vail discovered a burned automobile on his farm in the southern part of Macon County. Law-enforcement officials from several jurisdictions worked together and determined that the burned automobile was owned by Thompson. When law-enforcement officials reported the incident to Mary Splurge, Thompson's mother, she filed a missing person's report on her son. Several individuals were questioned with regard to Thompson's disappearance, including Irvin. All denied any knowledge of his whereabouts.
It was not until Irvin was arrested in the fall of 1999 for the murder of Dacqurie Lane that law-enforcement officials learned the fate of Thompson. During questioning, Irvin told officials that he and Alister Butler had killed Thompson by shooting him in the head while Thompson sat behind the wheel of his automobile. Irvin and Butler then took approximately $3,000 from Thompson's person, before driving Thompson's automobile to a remote location in Macon County and setting it on fire. Irvin and Butler then took Thompson's body to another remote location and abandoned it. Irvin took officials to where he and Butler had dumped Thompson's body. After law-enforcement officials determined that the human remains found belonged to Thompson, they arrested Irvin and Butler, and charged them with two counts of capital murder.
Dr. James Lauridson, the state medical examiner, testified that he was able to identify the remains of the body recovered in Macon County as belonging to Thompson by using dental records. Dr. Lauridson further testified that the injuries to Thompson's skull were consistent with a gunshot wound to the head. Given the nature of the injuries, Dr. Lauridson testified that it was "unlikely" that the injuries were caused by anything other than a gunshot.
The State's theory of the case was further supported by the testimony of witnesses Toria Howard and Norman Williams. Howard, Irvin's former girlfriend, testified that in 1998 Irvin threatened to "blow [her] fucking brains out like he did Jackie and that nigger in Atlanta." Williams testified that he was present on September 1, 1999, when Irvin robbed Dacqurie Lane, and then shot Lane in the head as Lane sat in his vehicle. Irvin and Williams then drove Lane's vehicle to a remote Macon County location and set it on fire, before driving to yet another isolated area and dumping Lane's body.
Contrary to Irvin's claim, the State presented ample evidence from which the jury could find Irvin guilty of two counts of capital murder in the death of Jackie Thompson murder committed during first-degree robbery, see § 13A-5-40(a)(2), Ala. Code 1975, and murder committed with a deadly weapon while the victim was inside a vehicle, see § 13A-5-40(a)(17), Ala.Code 1975. Thus, the circuit court correctly denied Irvin's motions for a judgment of acquittal.

Penalty-Phase Issues

VII.
In June 2002  at almost the same time as Irvin was being tried for capital *363 murder  the United States Supreme Court released Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)  two cases that dramatically impacted death-penalty cases throughout the United States. Because Irvin's case was not final when Ring was released, that decision is applicable to this appeal.[2] See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that "[c]apital defendants . . . are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589, 122 S.Ct. 2428.
Irvin argues that Apprendi and Ring require that the aggravating circumstances be set out in the indictment returned against him. Further, he argues, these decisions are consistent with well-established legal precedent mandating that the accused be provided notice of the facts upon which the State intends to rely at trial, particularly the aggravating circumstances it intends to establish. The State counters by arguing that Irvin's death sentence complies with applicable Alabama law and that nothing in Apprendi, Ring, or any other decision requires the State to include the aggravating circumstances in the indictment or to give an accused notice of the aggravating circumstances upon which the State intends to rely.[3]
This Court, in Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App. 2001) (opinion on return to remand), specifically rejected an argument virtually identical to Irvin's  namely, that "the indictment [against him] was void because it failed to include in the indictment the aggravating circumstances" that supported the capital offense. 868 So.2d at 1186. We rejected Stallworth's argument, holding that neither Ring nor Apprendi modified prior Alabama caselaw, "which holds that aggravating circumstances do not have to be alleged in the indictment." 868 So.2d at 1186. The indictment returned against Irvin advised him of the crime with which he was charged  the capital offense of murder during first-degree robbery, in violation of § 13A-5-40(a)(2), Ala.Code 1975  and set forth the elements of the offense that the State was required to prove. Included in the indictment was the aggravating circumstance of robbery in the first degree, thus placing Irvin on notice that, if convicted, he could be facing a death sentence. Because this single aggravating circumstance placed Irvin on notice that, if convicted of the charged offense he could be facing a potential death sentence, there is no merit to Irvin's contention that the State be required to include in the indictment all of the aggravating circumstances the State intended to prove at trial.
Likewise, neither Ring nor Apprendi requires that an accused be provided with advance notice of all the aggravating circumstances upon which the State intends to rely. Indeed, this Court has stated the following with regard to the other enumerated aggravating circumstances *364 listed in § 13A-5-49 that are not elements of a capital offense:
"The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment. Dobard v. State, 435 So.2d 1338, 1347 (Ala.Cr.App. 1982), aff'd, 435 So.2d 1351 (Ala. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances. Clark v. Dugger, 834 F.2d 1561, 1566 (11th Cir. 1987), cert. denied, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); Knotts v. State, 686 So.2d 431 (Ala.Cr.App. [1995]); Ruffin v. State, 397 So.2d 277, 282 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). The list of aggravating circumstances in § 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements."
Bush v. State, 695 So.2d at 87. Cf. Arthur v. State, 711 So.2d 1031 (Ala.Crim.App. 1996), aff'd, 711 So.2d 1097 (Ala. 1997) (when an aggravating circumstance relied on by the State is an element of the capital offense it must be charged in the indictment).
Here, Irvin was given notice of the aggravating circumstance that constituted an element of the capital offense with which he was charged. Accordingly, no basis for reversal exists regarding this claim.

VIII.
Irvin next argues that the decision in Ring invalidates Alabama death-penalty statute, specifically the capital-sentencing scheme. In addition to a general challenge to the capital-sentencing scheme, Irvin makes three specific contentions: (1) that the jury, not the trial judge, must find the existence of the aggravating circumstances; (2) that the jury must specify which aggravating circumstances it found to exist; and (3) that the jury's recommendation of death must be unanimous.
In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State's rationale that Ring did not invalidate Alabama's death-penalty statute, which vests the ultimate sentence determination in the hands of the trial judge and not the jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala. 2003); Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002); Duke v. State, 889 So.2d 1, 41 (Ala.Crim.App. 2002) (opinion on return to remand), cert. granted, sentence of death vacated pursuant to Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), Duke v. Alabama, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005); Turner v. State, 924 So.2d 737 (Ala.Crim.App. 2002); Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App. 2001) (opinion on return to second remand). In each of these cases, we recognized the narrowness of the United States Supreme Court's holding in Ring, noting that "[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt"; however, we noted that the Ring Court "did not reach the question whether judicial sentencing or judicial override was constitutional." Stallworth v. State, 868 So.2d at 1183 (opinion on return to second remand). Indeed, we quoted the following language from a footnote in Ring:
"`Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating *365 circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-91, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted [in Ring])). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) ("[I]t has never [been] suggested that jury sentencing is constitutionally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S., at 477, n. 3, 120 S.Ct. 2348, 147 L.Ed.2d 435 (Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to `presentment or indictment of a Grand Jury'").'"
Stallworth v. State, 868 So.2d at 1183-84 (quoting Ring, 536 U.S. at 597 n. 4, 122 S.Ct. 2428) (emphasis added).
Thus, Irvin's claim that Ring invalidates Alabama's capital-sentencing scheme is without merit.
Irvin also claims that Ring requires the jury find the existence of aggravating circumstances before a defendant may be sentenced to death. At first glance, Irvin's general claim is correct. This Court has long held that before a defendant is eligible for the death penalty, the jury must unanimously find the existence of at least one aggravating circumstance. However, this finding need not necessarily occur during the penalty phase of a defendant's trial. Indeed, this Court has recognized that if an element of the capital offense also constitutes an aggravating circumstance under § 13A-5-49, Ala. Code 1975, then the jury's verdict finding the defendant guilty of capital murder satisfies this requirement. See, e.g., Turner v. State, 924 So.2d at 785; and Stallworth v. State, 868 So.2d at 1184 (both cases recognizing that a jury's verdict finding the defendant guilty of murder committed during first-degree robbery made the defendant eligible for the death penalty; thus satisfying the Ring requirement). Here, just as in Turner and Stallworth, the jury unanimously found Irvin guilty of murdering Jackie Thompson during the commission of first-degree robbery, making him eligible for the death penalty. Thus, Ring was satisfied.
Irvin also argues that the jury must specify which aggravating circumstances it found to exist.
This Court has rejected similar claims in previous death-penalty decisions. See, e.g., Walker v. State, 932 So.2d 140, 147 (Ala.Crim.App. 2004); Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003). The Alabama Supreme Court has likewise rejected this argument. The Supreme Court has upheld a number of death sentences imposed after a jury's verdict merely indicated that it found the existence of at least *366 one aggravating circumstance during either the guilt-phase or the penalty-phase of his trial. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala. 2003); Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002). But see Ex parte McGriff, 908 So.2d 1024, 1039 (Ala. 2004) (authorizing prospective use of a penalty-phase special interrogatory). Thus, Irvin's claim that Ring requires the jury to specify which aggravating circumstances it found to exist is without merit.
Finally, Irvin argues that Ring requires that the jury's recommendation of death be unanimous. Ring makes no such argument. Moreover, both this Court and the Alabama Supreme Court have upheld death sentences imposed after the jury made a non-unanimous recommendation that the defendant be sentenced to death. See, e.g., Ex parte McNabb, 887 So.2d 998, 1000 (Ala. 2004) (jury recommended death by 10-2 vote); Stallworth v. State, 868 So.2d at 1136 (jury recommended death by 10-2 vote). Accordingly, Irvin's argument is without merit.

IX.
Irvin argues that Ring prohibits the trial judge from instructing the jury that its verdict is advisory. Rejecting a similar claim in Duke v. State, 889 So.2d at 43 (Ala.Crim.App. 2002) (opinion on return to remand), this Court noted:
"Duke also argues that Ring requires penalty-phase relief when the jury is told that its verdict is `advisory' or merely a `recommendation.' Contrary to Duke's contention, Ring does not address the advisory nature of a jury's sentencing recommendation. Duke's jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala.Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala. 1995), cert. denied, 516 U.S. 1120 (1996)."
Here, the circuit court properly instructed the jury of its role under § 13A-5-46, Ala.Code 1975, taking care to emphasize the fact that its verdict was merely advisory did not absolve the jury of its responsibility in determining the appropriateness of the death sentence. Indeed, the court instructed the jury:
"The weighing and comparing of aggravating and mitigating circumstances requires the exercise of good, sound judgment on your part. It is not a matter of unbridled discretion.
"A human life hangs in the balance. It is a matter of calm reflection, not for indulgence of emotion. You're to weigh the aggravating and mitigating circumstances and honestly and rationally evaluate the two options before you in light of those circumstances. Your verdict, as always, is based on the evidence."
(R. 1163.)
Our review of the record indicates that the circuit court properly instructed the jury of its role in the sentencing process under Alabama law. The court's instructions did not run afoul of either Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), or Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). No basis for relief exists as to this claim.

X.
Irvin next argues that the circuit court erred in refusing to conduct a new penalty-phase hearing because, he claims, the court erroneously instructed the jury regarding the weighing of aggravating circumstances and mitigating circumstances. Specifically, Irvin contends that the court erred by not explicitly instructing the jury *367 that it could not recommend that Irvin be sentenced to death if it found that the aggravating circumstances were equal to the mitigating circumstances. As authority for this contention, Irvin cites the Alabama Supreme Court's decision in Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala. 2002).
When reviewing a trial court's jury instructions, this Court keeps in mind the following principles:
"A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App. 1992). When reviewing a trial court's instructions, `"the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together."' Self v. State, 620 So.2d 110, 113 (Ala.Cr.App. 1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App. 1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992)."
Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App. 1999), aff'd, 795 So.2d 785 (Ala. 2001). "The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weigh against his claim of prejudice." Ex parte Boyd, 715 So.2d 852, 855 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
Irvin's reliance on Ex parte Bryant is misplaced because it is factually distinguishable from his case. In Ex parte Bryant, the Supreme Court held that the trial court erred when it did not explicitly instruct the jury that it could recommend a death sentence only if it determined that the aggravating circumstances outweighed the mitigating circumstances. Thus, the Supreme Court concluded, the trial court had allowed the jury to conclude that the death penalty was appropriate even if the aggravating circumstances did not outweigh the mitigating circumstances so long as the mitigating circumstances did not outweigh the aggravating circumstances. ___ So.2d at ___.
When taken in its entirety, the circuit court's instructions in this case do not run afoul of Ex parte Bryant, as seen from the following lengthy excerpt:
"Unless at least one aggravating circumstance exists  and there are only two for your consideration  the sentence must be life without parole.
"In my earlier charge, I discussed the meaning of reasonable doubt, and that phrase has the same meaning in this hearing. The State has the burden of proving beyond a reasonable doubt to each of you the existence of an aggravating circumstance. However, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for the purpose of the sentencing hearing.
". . . .
"It is your duty and task to weigh the relative merits of the aggravating and mitigating circumstances in reaching your verdict. The process of weighing the aggravating and mitigating circumstances to determine the sentence is not a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. . . .
"After deliberations, you're to return a verdict as follows: If you determine that no aggravating circumstance exists, you shall return a verdict of life imprisonment without the possibility of parole. If you determine that one or more aggravating *368 circumstances exist but do not outweigh the mitigating circumstances, you shall return a verdict of life imprisonment without parole.
"If you determine that one or more aggravating circumstances exist which outweigh the mitigating circumstances, you shall return a verdict of death. Your decision to return a verdict for a sentence of life imprisonment without parole must be based on a vote of the majority of the jurors. A decision to return a sentence of death must be based on a vote of at least 10 jurors."
(R. 1159-62.)
Initially, we note that the court's instructions were materially identical to Alabama's pattern jury instructions regarding these legal principles. This Court, as well as the Supreme Court have generally declined to find plain error when the trial court gives an instruction materially identical to the pattern jury instructions. "A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App. 1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); accord Lewis v. State, 889 So.2d 623, 690 (Ala.Crim.App. 2003).
Moreover, because the circuit court in this case instructed the jury that it could not recommend a death sentence unless it determined that the aggravating circumstances outweighed the mitigating circumstances, we find this case is more factually analogous to Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997), than it is to Ex parte Bryant. In Ex parte Trawick, the Alabama Supreme Court held that the circuit court does not commit plain error if it fails to instruct the jury that it must recommend life imprisonment without parole if it determines that the aggravating circumstances and the mitigating circumstances are equally balanced, so long as the court instructs the jury that it may only recommend death if the aggravating circumstances outweigh the mitigating circumstances. 698 So.2d at 173-74.
After carefully reviewing the circuit court's instructions, we do not agree with Irvin that the court's instruction could have misguided the jury regarding its responsibility and function in weighing the aggravating circumstances and the mitigating circumstances. Thus, we find no plain error in the instruction as given.

XI.
Irvin argues that the circuit court erred in sentencing him to death when his codefendant, Alister Butler, received a sentence of life imprisonment without the possibility of parole as a result of his convictions for the same robbery-murder. Specifically, Irvin argues that because his codefendant was not sentenced to death, Irvin's sentence of death is "excessive and disproportionate." Because this issue was not raised at trial, we review this claim under the plain-error doctrine.
Addressing this issue, the Alabama Supreme Court has written:
"The law does not require that each person involved in a crime receive the same sentence. Wright v. State, 494 So.2d 726, 739 (Ala.Crim.App. 1985) (quoting Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)). Appellate courts should `examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.' Beck v. State, 396 So.2d 645, 664 (Ala. 1980). However, the sentences received by codefendants are not controlling per se, Hamm v. State, 564 So.2d 453, 464 (Ala.Crim.App. 1989), *369 and this Court has not required or directed that every person implicated in a crime receive the same punishment. Williams v. State, 461 So.2d 834, 849 (Ala.Crim.App. 1983), rev'd on other grounds, 461 So.2d 852 (Ala. 1984). `"There is not a simplistic rule that a codefendant may not be sentenced to death when another co-defendant receives a lesser sentence."' Id. (quoting Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979))."
Ex parte McWhorter, 781 So.2d 330, 344 (Ala. 2000) (emphasis supplied). This Court has likewise declined to abandon the practice of individualized sentencing based on a defendant's particular role in the capital offense. See, e.g., Taylor v. State, 808 So.2d 1148, 1201 (Ala.Crim.App. 2000), aff'd, 808 So.2d 1215 (Ala. 2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002), in which this Court upheld imposition of Taylor's death sentence based on the fact that Taylor  and not his codefendant  was the triggerman who actually shot and killed the victim.
Here, just as in Ex parte McWhorter and Taylor v. State, the evidence indicated that Irvin, the defendant, rather than Butler, the codefendant, was the triggerman in Thompson's murder. Moreover, the trial court determined that Irvin acted without provocation when he shot Thompson in the head as Thompson sat in the driver's seat of his vehicle. Additional evidence indicated that Irvin was the dominant actor during the murder of Dacqurie Lane under circumstances similar to the ones surrounding Thompson's murder. Toria Howard also testified that Irvin had threatened to shoot her in the head, just like he did Thompson and Lane. Given these circumstances, the circuit court correctly concluded that death was the appropriate sentence for Irvin.

XII.
As required by § 13A-5-53, Ala. Code 1975, we will now address the propriety of Irvin's death sentence.
Irvin was indicted for and convicted of two counts of capital murder: (1) murdering Jackie Thompson during the commission of first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975; and (2) using a deadly weapon to murder Thompson, while Thompson was inside a vehicle, see § 13A-5-40(a)(17), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Irvin be sentenced to death.
The record reflects that Irvin's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The circuit court found that the aggravating circumstances outweighed the mitigating circumstances and mandated that Irvin be sentenced to death. With regard to Irvin's conviction for the capital offense of murder committed during first-degree robbery, the court found the existence of two aggravating circumstances: (1) that the capital offense was committed while Irvin was engaged in or was an accomplice in the commission of first-degree robbery, see § 13A-5-49(4), Ala.Code 1975; and (2) that Irvin committed the capital offense after having been convicted of another capital offense or of a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975. The circuit court found the existence of none of the mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975, specifically referencing each of the seven statutory mitigating circumstances enumerated in § 13A-5-51. The court found the existence of nonstatutory mitigating circumstances, as provided for in § 13A-5-52, Ala.Code 1975, based on evidence presented concerning the circumstances of Irvin's *370 life, particularly the fact that Irvin's father had died when he was approximately two years old, that Irvin was the father of eight children, and that Irvin had recently "received Christ" while in jail awaiting trial. The court also noted that Irvin had taken law-enforcement officials to where he had abandoned the victim's body, an act which arguably reflected Irvin's remorse. Nevertheless, the court concluded, "all the mitigating circumstances taken together do not approach the weight of the aggravating circumstances in this case," and it found that Irvin's conviction for the capital offense of murder committed during the commission of first-degree robbery the proper sentence under the law was death.
With regard to Irvin's conviction for the capital offense of murder committed using a deadly weapon while the victim was inside a vehicle, the court found the existence of one aggravating circumstance, namely that Irvin committed the capital offense after having been convicted of another capital offense or of a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975. The circuit court found the existence of none of the mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975, again referencing each of the seven statutory mitigating circumstances enumerated in § 13A-5-51. The court found the existence of nonstatutory mitigating circumstances, as provided for in § 13A-5-52, Ala.Code 1975, based on evidence presented concerning the circumstances of Irvin's life and evidence of his remorse. However, the court again determined that "all the mitigating circumstances taken together do not approach the weight of the aggravating circumstances in this case," and it found that for Irvin's conviction for the capital offense of murder committed with a deadly weapon while the victim was inside a vehicle the proper sentence under the law was death.
The circuit court's finding that the aggravating circumstance that the murder was committed after Irvin had previously been convicted of another capital offense or of a felony involving the use or threat of violence to the person is supported by the evidence. The State's proof of Irvin's 1998 conviction for armed robbery supports a finding of this aggravating circumstance. See Hadley v. State, 575 So.2d 145, 156 (Ala.Crim.App. 1990), aff'd on return to remand, 588 So.2d 938 (Ala.Crim.App. 1991) ("Historically, offenses which have been found to uphold [§ 13A-5-49(2)] include: armed robbery . . ."). The circuit court's finding that Thompson's murder was committed during the commission of first-degree robbery is likewise supported by the record, as are the circuit court's findings regarding statutory and nonstatutory mitigating circumstances. We agree with the circuit court's findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to independently weigh the aggravating and mitigating circumstances to determine the propriety of Irvin's death sentence. After independently weighing the aggravating circumstances and the mitigating circumstances, we find that the death sentence is appropriate in this case.
As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether Irvin's death sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Irvin was found guilty of the capital offense of murder committed during first-degree robbery, pursuant to count one of the indictment. Approximately two-thirds of the death sentences imposed in Alabama are as a result of a conviction for robbery-homicide. See, e.g., Stallworth v. State, 868 So.2d 1128, 1188 (Ala.Crim.App. 2001), cert. denied, 868 So.2d 1189 (Ala. 2003); Smith v. State, 795 So.2d 788, 842 (Ala. *371 Crim.App. 2000), cert. denied, 795 So.2d 842 (Ala. 2001); McWhorter v. State, 781 So.2d 257, 330 (Ala.Crim.App. 1999), aff'd, 781 So.2d 330 (Ala. 2000). Under count two of the indictment, Irvin was found guilty of the capital offense of murder committed with a deadly weapon while the victim is inside a vehicle. This Court has upheld imposition of the death sentence in cases involving this particular capital offense. See, e.g., Flowers v. State, 799 So.2d 966, 995-96 (Ala.Crim.App. 1999); Farrior v. State, 728 So.2d 691, 700-02 (Ala.Crim.App. 1998).
Finally, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error that may have adversely affected Irvin's substantial rights and have found none. Irvin's convictions and sentences of death for the murder of Jackie Thompson, are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Atkins addresses the rights of mentally retarded persons who have been sentenced to death. Nothing in the record suggests that Irvin was mentally retarded. Thus, Atkins has no application to this case.
[3] Because Ring specifically applies the legal principles set out in Apprendi to death-penalty cases, we will couch our discussion of Irvin's claims in terms of what Ring requires, rather than Apprendi.