WELCH, Judge,
dissenting.
I agree with the majority that the principles quoted in Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005), govern the resolution of the first issue — whether the trial court erred in admitting evidence, pursuant to Rule 404(b), Ala. R. Evid., about the murders of the four Hispanic men who were killed days after Stevon Lockett was murdered. I disagree with the majority’s application of those principles, however. The record in this case presents a textbook example of the reason the exclusionary rule prohibiting collateral-act evidence was created; the extensive evidence of collateral acts in Billups’s trial for the murder of Lockett permitted this trial to become, for all intents and purposes, a trial for murders of the four Hispanic men as well. The inadmissible collateral evidence diverted the jurors’ minds from the main issue of Billups’s criminal responsibility for Lockett’s death and had an irreversible impact on the jury’s decision-making process in this case. Therefore, I must dissent.
Although the collateral-act evidence presented in this case might have fit within an exception to the exclusionary rule, the analysis does not end with that determination. The evidence was not reasonably necessary to the State’s case, and its prejudicial effect far outweighed any probative value it might have had. The trial court committed reversible error when it admitted the collateral-act evidence. Billups is entitled to a reversal of his conviction and to a new trial.

The General Rule is One of Exclusion.

It has long been the rule that a defendant’s guilt or innocence is to be based on evidence relevant to the crime with which he is currently charged. Collateral evidence is generally forbidden, and that rule of exclusion is premised on the not-at-all novel concept noted in the Irvin quotation in the majority opinion that the exclusionary rule serves to protect the defendant’s right to a fair trial because the prejudicial effect of prior-crime evidence is likely to far outweigh any probative value that might be gained from admitting the evidence. The quotation in the majority opinion also includes a citation to Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), in which the Alabama Supreme Court recognized that the prior-crimes evidence “ ‘has almost an irreversible impact upon the minds of the jurors.’ ” (Quoting Charles W. Gamble, McElroy’s Alabama Evidence § 69.01(1) (3rd ed.1977).) The dangerous impact, of course, is that the jury might decide that because a defendant committed some other, similar crime, he must also have committed the crime for which he is then on trial.
Exceptions to the rule of exclusion exist, but they are just that — exceptions. The logical intent of an exception to the general rule of exclusion is that, on occasion, evidence of prior crimes that would generally be excluded might be allowed if the evidence meets certain specific criteria, which are also quoted in the majority’s opinion. Furthermore, the extensive quotation in the majority’s opinion included the following significant point:
“ ‘ “However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. 1 “Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the *1073 charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects. ” ’ Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting United States v. Turquitt, [557 F.2d 464,] 468-69 [(5th Cir.1977) ].” ’ ”
86 So.3d at 1044-45 (quoting Irvin v. State, 940 So.2d 331, 346 (Ala.Crim.App.2005), quoting in turn Robinson v. State, 528 So.2d 343, 347 (Ala.Crim.App.1986)).
As discussed below, a complete analysis of the facts in light of the relevant legal principles leads me inescapably to the conclusion that the trial court erred to reversal when it admitted the extensive collateral evidence about the quadruple murder.

Purported Purposes for Admission of the Testimony.

The majority concludes that evidence about the killing of the four Hispanic males was admissible under the intent, motive, and plan or pattern exceptions to the general exclusionary rule. However, the trial court appeared to admit the evidence based solely on its determination that the crimes were similar. (R. 11-12.) I also find it interesting that, in its brief to this Court, the State asserts, “At no point did the State ever suggest it was offering this evidence solely to prove intent. The State offered this evidence primarily to prove plan, motive, and identity of the killer.” (State’s brief, at p. 18, n. 14.) The evidence of the quadruple murders was in no way admissible to prove plan or identity. Although the evidence may have been relevant to show motive, for reasons discussed in a subsequent part of this dissent, the evidence was not reasonably necessary to prove motive and the prejudicial impact of the evidence so outweighed its probative value that the motive exception did not justify its admission into evidence.
The State .filed a pretrial motion seeking the court’s permission to admit evidence of the quadruple homicide pursuant to Rule 404(b), Ala. R. Evid. The State at that time declared no purpose for the admission of the evidence, but when the trial court considered the issue it stated that the evidence was admissible “just based upon the close proximity, the fact that the same weapon was used, and the fact that they are very similar.” (R. 11.) The State then devoted a substantial portion of its opening argument to its version of the facts in the quadruple-murder case, and it even displayed photographs of the four victims. During the trial, the court asked the State, “Under 404(b), what are the particular things that the State is looking at?” (R. 453.) One of the prosecutors replied, “Well, we’re looking at the same cause of death: multiple gunshot wounds to the head. We’re looking at the similar motive: to steal drugs. We’re looking at the same gun used in both crimes. I mean, it’s multiple things, multiple similarities.” (R. 453-54.) It is important to note that the State did not argue that evidence of the quadruple murders was relevant to show opportunity, intent, preparation, knowledge, or absence of mistake or accident. During the testimony of Charles Cooper, an alleged accomplice of Billups’s who testified that he had participated in the quadruple murders with Bill-ups, the trial court instructed the jury that Cooper’s testimony about the quadruple murders could be considered only if the jury believed it was “relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of *1074 mistake or accident in Stevon Lockett’s death.” (R. 792.)
I disagree with the majority’s conclusion that the two offenses were so similar that they were committed in the same novel and peculiar manner, thus making evidence about the quadruple murder admissible as an exception to the exclusionary rule.
“ ‘[T]he plan, scheme, or design exception is an extension of the identity exception — where the charged crime and the collateral crime are committed in the same novel or peculiar manner, evidence of the collateral crime is admissible to identify the defendant as the perpetrator of the charged crime.’ Register v. State, 640 So.2d 3, 6 (Ala.Crim.App.1998). See also Ex parte Darby, 516 So.2d 786, 789 (Ala.1987) (the common scheme or plan exception has been held to be ‘coextensive with the identity exception’). The circumstances of the charged crime and the collateral crime must ‘exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.’ Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983).”
McClain v. State, 26 So.3d 491, 493-494 (Ala.Crim.App.2009). In Moore v. State, 49 So.3d 228 (Ala.Crim.App.2009), this Court again acknowledged the foregoing principles — requiring that evidence of a prior crime be admitted under the identity exception only when the two crimes are so similar that anyone viewing them would naturally assume that they were committed by the same person. After reviewing the factors that distinguished the two crimes, this Court held that evidence of a prior robbery had been admitted erroneously under the identity exception in Moore’s trial on charges of burglary-murder and attempted murder, noting that they had not been committed in a novel or peculiar manner.
The degree of similarity between these two crimes was not great. Lockett, an experienced drug dealer, was shot several times in the head and once in the back while he was at Billups’s residence participating in another drug transaction with Billups, who was his friend. According to Cooper, the attack by Billups had been spontaneous. Lockett’s body was dragged to Billups’s basement and removed from the scene in Lockett’s own vehicle, and Lockett’s body and vehicle were then set afire, presumably to destroy the evidence. Cooper told the police that Billups and his girlfriend were cleaning the blood from his kitchen where the shooting occurred, and Cooper testified at trial that Billups had blood on his hands when he saw Billups. Billups gave Cooper two bags of marijuana on the morning after Lockett was killed. Cooper also testified that he had met Lockett after Lockett had a problem with cocaine he had purchased from Billups. Cooper testified that the cocaine had been diluted with a “cutting agent” and that he had told Lockett to get his money back from Billups. Billups refunded Lockett’s money, Cooper said. Cooper testified that some time after Lockett was killed, Billups told him that he took a pistol, eight pounds of marijuana, and four and one-half ounces of cocaine from Lockett. Cooper also said that Billups told him that he did not like Lockett.
The details of the collateral crime are vastly different. Two Hispanic men, Pablo Stuart and Osman Valladres, went to Bill-ups’s residence to purchase illegal drugs. Several people at Billups’s residence, including Billups and Cooper, drew guns, assaulted and threatened the men, then restrained them with duct tape. Valladres was forced to telephone other men to encourage them to bring drugs to his apart *1075 ment, and Billups and his confederates allegedly discussed plans to rob the drug dealers when they arrived at Valladres’s residence. The four Hispanic men were not lured to Billups’s residence. Stuart and Valladres were then taken to Valla-dres’s apartment, and when the four Hispanic drug dealers arrived with a large quantity of drugs, those four men were shot and killed, and the drugs they brought with them were stolen. The bodies were left in the apartment; the killer or killers did nothing to attempt to conceal the murders. There was no evidence indicating that Billups had any animus toward any of the victims or that he had had any prior disagreements with any of them. The circumstances surrounding the shootings are not at all similar, and they certainly do not establish a signature crime. The differences between the two crimes are far more evident than are the similarities. That young male drug dealers were shot and killed during a drug deal is, unfortunately, neither unique or peculiar today.
The majority notes that all the victims were shot in the head, but the forensic pathologist who conducted the autopsies of all the victims testified that they sustained numerous other gunshot wounds as well as shots to the head. Lockett was also shot in the back, and the forensic pathologist testified that it appeared that Lockett was still alive when that wound was inflicted. In addition to being shot in their heads, the Hispanic victims were shot in the face and neck, the back of shoulder, the back, the hip, the thigh, the arm, the chest, and the wrist. The fact that all the victims sustained gunshot wounds to the head is less remarkable when it is considered in light of all the evidence regarding the location of the wounds the victims sustained. Thus, the fact that the victims were shot in the head also fails to make these crimes novel and peculiar; admission of the collateral evidence was not sustainable on this ground, either.
The majority also states that “there was evidence indicating that the same gun was used at both crime scenes.” 86 So.3d 1051. To the extent the majority intends to imply that the evidence established that same gun fired the fatal shots at both crime scenes, this implication is not supported by the record. The weapon that fired all the bullets into Lockett’s body was never recovered, but testimony established that a different weapon fired all the bullets into the bodies of the Hispanic men. The gun in the quadruple shooting was also never recovered. The State established only that a shell casing found at Billups’s house matched a shell casing found at Valladres’s apartment. Those shell casings did not match the bullets from any of the victims’ bodies. Testimony further established that alleged accomplice Cooper told his attorney about a handgun in a lake, and a diver recovered the weapon. The matching shell casings came from the gun recovered from the lake. No testimony established any connection between Billups and the gun recovered from the lake. No testimony established when or how either of the shell casings came to be deposited at the crime scenes. One of the prosecutors frankly admitted to the trial court:
“The only thing that connects the two scenes as far as guns or ballistics or anything are those two shell casings and that gun from the lake. Those two shell casings match the gun from the lake. So the significance is it corroborates the testimony in the [quadruple-murder] ease that there was one shooter or predominantly one shooter. There were 11 shell casings from the [quadruple-murder] scene that all matched and one that didn’t. The -witnesses said that everything at the [quadruple-murder] scene *1076 pointed to predominantly one shooter other than that one shell casing.”
(R. 489.)
The majority’s conclusion that the similarities in the crime scenes established that the crimes were committed in a novel and peculiar way is not supported by evidence. The majority’s conclusion is also not supported by the law. In Hurley v. State, 971 So.2d 78 (Ala.Crim.App.2006), this Court explained what the prosecution must prove to establish that the identity/common plan exception should be applied:
“ ‘Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated ... rapes. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.’ 1 McCormick on Evidence § 190 at 801-03 (4th ed.1992) (footnotes omitted). See, e.g., Ex parte Baker, 780 So.2d 677, 679-80 (Ala.2000); Bighames v. State, 440 So.2d 1231, 1233 (Ala.Crim.App.1983).
“There are similarities between the present charge and the collateral offense: i.e., Hurley by appearing to be a ‘nice gujf and a ‘gentlemen,’ gained the trust of the victims; both victims were young; and both victims were raped. These similarities, standing alone, however, do not show a common scheme or plan, so that anyone viewing the offenses would say that the now charged crime was committed in the same novel or peculiar manner as the previous crime.”
971 So.2d at 83.
Considering all the circumstances of charged crime and the collateral crime, I do not believe that a reasonable person viewing the two offenses would naturally assume that the same person committed both crimes. The collateral-act evidence contributed nothing toward proving that Billups had a common plan or scheme and that he executed that plan when he killed Lockett, took Lockett’s illegal drugs, transported Lockett’s body from his residence in Lockett’s truck, and burned Lockett’s truck and body to destroy the evidence. These crimes were not both committed in such a novel or peculiar way as to make evidence regarding the quadruple murders admissible under the identity or common plan, scheme, or design exceptions to the exclusionary rule.

The Balancing Test: Reasonable Necessity and Undue Prejudice.

In Irvin v. State, quoted by the majority, this Court recognized that evidence of another crime must not only fit within an exception to the exclusionary rule, but also that a balancing test must be applied to determine whether the evidence is reasonably necessary to the State’s case and whether its probative value outweighs its potential prejudicial effects. For the reasons explained below, the evidence of the quadruple murders was not reasonably necessary to the State’s case, and its probative value was far outweighed by its prejudicial effects. A balancing of all the relevant factors in this case leads only to the conclusion that the collateral-act evidence was inadmissible.
The State’s evidence against Billups in the Lockett shooting was substantial. Cellular telephone records indicated that Lockett and Billups had spoken by telephone several times before Lockett left his residence to complete a drug transaction. Lockett’s girlfriend testified that Lockett and Billups had previously engaged in drug transactions. Cooper testified that he saw Billups and his girlfriend cleaning blood from the kitchen floor of Billups’s residence the day after Lockett was killed, and that Billups told him that he had had to kill Lockett the night before. Cooper *1077 testified that Billups acknowledged again in another conversation that he had killed Lockett and had stolen his money and his drugs, and he told Cooper that he did not like Lockett. Lockett’s DNA was found in Billups’s house, along with bloodstains in the kitchen and at the bottom of the stairs that led from the kitchen to the garage. Lockett’s gun was found in Billups’s residence. The identity of Billups as Lock-ett’s shooter was not in any real doubt, nor was his motive and intent. Evidence of the quadruple murders was, therefore, not reasonably necessary to the State’s ease to establish any of those issues.
Although the trial court appeared to hold that evidence about the quadruple murders was admissible because it was similar to Lockett’s murder, the majority holds that evidence about the quadruple murders was relevant to prove intent, motive, identity, and common plan or scheme. As I have discussed above, the two crimes — Lockett’s murder and the quadruple murders — were not committed in a novel or peculiar way indicating a signature crime, so the collateral evidence did not even fit within that exception. As to the State’s need for the evidence in order to prove motive and intent, there was no real question about Billups’s motive or intent if, as the State alleged, he shot Lock-ett, robbed him of his drugs and money, and burned his body in his vehicle. Evidence that Billups robbed and murdered other drug dealers was not necessary to establish Billups’s motive or intent as to Lockett, and the evidence was not admissible as an exception to the exclusionary rule for that purpose, either. See Ex parte Jackson, 33 So.3d 1279, 1285-1286 (Ala.2009) (“Finally, even if we were to conclude that evidence of Jackson’s capital-murder conviction somehow fell within one of the exceptions in Rule 404(b), Ala. R. Evid., to the general exclusionary rule, the State has not demonstrated that the evidence was reasonably necessary to its case.”).
In addition to the fact that the evidence about the quadruplé murders was unnecessary to the State’s case, the evidence was overwhelmingly and unduly prejudicial to Billups. The State presented such substantial evidence and argument about the quadruple-murder case, beginning in its opening argument to the jury when it displayed photographs of the four victims, that the record reads almost as if Billups were being tried for both crimes in this trial. There was no way the jury could have excluded consideration of the significant and detailed collateral evidence as impermissible character evidence and there was a substantial danger that the jury would have made an impermissible inference, based on the collateral evidence, that Billups was a depraved massacring killer so he probably killed Lockett, too. Allowing the jury to hear the collateral evidence was far more prejudicial than probative of the issues the majority contends it was admissible to prove.
I find, as this Court previously stated in Stephens v. State, 53 Ala.App. 371, 300 So.2d 414 (Ala.Crim.App.1974), “Without question, the admission of this testimony was prejudicial, adding increments of unrelated guilt to the weighing pans of the scales of justice.” 53 Ala.App. at 373, 300 So.2d at 415, quoted in Ex parte Casey, 889 So.2d 615, 620 (Ala.2004), quoted in turn in Osborn v. State, 910 So.2d 811, 817 (Ala.Crim.App.2005).
I can only conclude, based on a review of the evidence in light of all the relevant legal principles, that the trial court abused its substantial discretion when it permitted the State to present evidence of the quadruple murders.

The Jury Instructions Were Also Faulty.

Although I believe that Billups’s conviction should be reversed based on the im *1078 proper admission of the substantial and unduly prejudicial evidence about the collateral crime, I am compelled to note, additionally, that the trial court’s instructions to the jury were inadequate and that they actually exacerbated the error caused by the admission of the evidence. First, without any limiting instruction from the trial court, the State presented in its opening argument the details of quadruple murders, just as it presented the evidence in the Lockett case that it planned to prove at trial. Second, a significant amount of evidence about the quadruple murders was presented by the State at trial without any limiting instruction being given to the jury. Third, accomplice Charles Cooper testified for the State and admitted that he had pleaded guilty to the murders of the four Hispanic men and that he was testifying against Billups in exchange for a sentence of life imprisonment in that case. After Cooper began testifying about his and Bill-ups’s involvement in the kidnapping and quadruple murders, the trial court instructed the jury as follows:
“You’re hearing testimony today about another incident that allegedly occurred, not the same one that Mr. Billups is actually charged with in this case.
“The law is clear that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action and conformity therewith. In other words, evidence of other crimes allegedly committed by the defendant cannot be used to show bad character.
“The evidence being presented regarding other acts allegedly committed by the defendant can be considered by you only for the purpose of determining either motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. I’m going to repeat those for you. But if you think the evidence from the other case is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in Stevon Lockett’s death, then you can consider this evidence. But it cannot be used by you for any other purpose; all right?”
(R. 791-92.)(Emphasis added.) In its charge to the jury at the conclusion of all the evidence, the trial court again instructed the jury that the collateral evidence could be considered as to issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Thus, although the majority has correctly stated that the trial court did issue “limiting” instructions, those instructions were wrong as a matter of law. The trial court accepted the State’s invitation at trial (R. 779-80) to instruct the jury that it could use the collateral-act evidence for any of the reasons listed in Rule 404(b), even though the State never argued that the evidence was admissible for most of those purposes. The State never argued that evidence about the quadruple murders fell within the exceptions in the exclusionary rule for evidence related to opportunity, preparation, knowledge, or absence of mistake or accident. Thus, the trial court, by issuing its erroneous instructions, greatly enhanced the prejudice caused when evidence about the quadruple murders was admitted because the erroneous instructions permitted the jury to consider the illegal evidence for many issues other than those for which it was purportedly admitted.
This Court considered a similar issue in McAdory v. State, 895 So.2d 1029 (Ala. Crim.App.2004), when the trial court incorrectly instructed the jury about the issues relative to which evidence of the defendant’s prior crimes could be considered. *1079 The Court stated: “A limiting curative instruction only mitigates the prejudicial admission of illegal evidence if the instruction is legally sound. The jury could not have considered the prior convictions for knowledge and intent because neither was at issue.” 895 So.2d at 1086. Thus, not only was substantial, prejudicial evidence about the quadruple murders erroneously admitted, but the jury also received misleading instructions that permitted it to consider that prejudicial evidence for issues far beyond those for which the evidence was initially admitted. The confusion of the jury and the probable prejudice to Billups is obvious and exacerbated the devastating harm that resulted from the erroneous admission of the testimony. Although defense counsel did not object to the instructions, based on the record as a whole, I believe that the error affected Billups’s substantial rights and that it seriously affected the fairness and integrity of the proceeding against him. Therefore, this constitutes plain error. Rule 45A, Ala. R.App. P.

Conclusion

Significant reversible error occurred when the trial court admitted vast amounts of evidence about an unrelated, horrendous crime against four victims, in violation of the principles governing the admission of other-crimes evidence. Bill-ups is entitled to a reversal and a new trial.
For all the foregoing reasons, I dissent.